[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This case was remanded by the Supreme Court for further proceedings in this court after the Supreme Court declined to answer two questions reserved to it. See City Recycling Inc.v. State of Connecticut, 247 Conn. 751, 725 A.2d 937
(1999). CT Page 3180
This court has determined that the issue presented to it as interpreted in light of the Supreme Court's opinion is: Whether the proposed expansion of the plaintiffs facility to operate a volume reduction facility presents a reasonable possibility of environmental hazards.
In evaluating this question, the court has reviewed and accepts the stipulation of facts adopted by the parties, and has held a full evidentiary hearing. The court also reviewed proposed findings of facts presented by each party after the hearing, and hereby finds the facts set forth in the court's Findings of Facts of even date herewith and filed with this memorandum of decision.
Having considered all the evidence as aforesaid, the court concludes that the plaintiff has proven that the proposed expansion of its facility presents no reasonable possibility of environmental hazards.
 FINDINGS OF FACTS
1. In 1987, the State of Connecticut mandated recycling in its solid waste management plan. It put the burden on private refuse companies to remove recyclables from the waste stream. Initially, "recyclables" included bottles, cans, plastics, office paper and corrugated paper. The list was subsequently expanded to include construction and demolition material.
2. At the source, construction and demolition materials including recyclables have to be separated from general garbage; and, at a volume reduction facility, sorted out by type.
3. City Recycling started out at 52 Poplar Street in Stamford, handling only paper products. By late 1994, City was running out of space at that site.
4. City selected its current site at 61 Taylor Reed Place, Stamford because it had two and a half acres, a 30,000 square foot building, rail sidings on two sides, and truck access off Route 106 (a State highway) within one mile of I-95.
5. When City bought the Taylor Reed Place property in 1995, there was no local opposition. The site had previously been used as a manufacturing plant for a boiler company and, before that, by the Cocoa Marsh Company. CT Page 3181
6. Exhibits 1-9 are aerial photographs of the City Recycling site and the surrounding neighborhood. The photographs show that City borders on a railroad track and a spur line which serviced the area in the 1960s. The area is industrial on both sides of the railroad track.
7. The Glenbrook Community Center which houses the daycare facility is on Crescent Street. Trucks coming to and going from City Recycling do not travel on Crescent Street (Exhibits 2, 3, 7-9).
8. The Glenbrook Community Center is surrounded by the Sclafani Products Distribution Center and its trailers as well as the Deluca Company yard and trailers. City Recycling does not directly abut the Community Center (Exhibits 2 and 3).
9. When City acquired the site, renovation was necessary for recycling activities to be performed inside the building. Recycling requires an interior ceiling height of 30 feet so that trucks can pull into the facility and tip their loads.
10. The current facility (Exhibit 4) was renovated by removing the previous two floors of office space and constructing an open area, extensive masonry and structural support, the installation of loading docks, and drainage work performed by Frattoroli which installed sewers, a Vorteck floatables and sediment separator, and 22 galleys to keep storm water on the property. The cost of the renovation exceeded $500,000.
11. At the time City moved to Taylor Reed Place in Stamford in 1995, construction debris was about 25% of their business. City disposed of that debris at Southern Connecticut Recycling in Stamford and at a Norwalk facility and paid fees to recycle that debris at the other facilities. City wanted to increase its capacity so it could handle construction debris an other non-hazardous recyclables to make up the cost of renovating the Taylor Reed Place property.
12. Southern Connecticut Recycling, a facility in Stamford's South End to which City took construction debris (Exhibit 18) is directly across the street from the Latham Wider Community Center, which houses a child care center, a senior citizen center and other programs. CT Page 3182
13. The state was encouraging recyclers to process as many non-hazardous items as possible. In August of 1995 City contacted the DEP to inquire about the application procedure for expanding to become a Volume Reduction Facility ("VRF"). The DEP told City that it needed local zoning permission before it could apply to the DEP.
14. In order to prepare for a presentation to the Stamford Planning and Zoning Board, City hired Redniss Mead, local planners and surveyors. In November 1996 City submitted building and drainage plans to the Stamford P Z, which included plans for drainage, sediment and erosion control; the DEP would not permit any drainage out from the building (Exhibit 11).
15. There were two notices in the paper concerning City's application; there were also two hearings by the Stamford P Z.
16. Stamford P Z did its own traffic studies of City's application.
17. In preparation for the P Z hearing, Michael Ferro and his partner Anthony Terenzio, visited all abutting neighbors to explain their plans and asked if any of the neighbors had concerns. None of them had concerns about the project and all of them signed a petition of support of the application (Exhibit 12).
18. The application was also supported by Jerry Pia, the director of Activities for Kids, the daycare center located in the Community Center Building (Exhibit 13) which was less than one-quarter of a mile away from City Recycling's site.
19. At the time City submitted its application to the Stamford P Z, it had the right to operate 24 hours a day. There were no limits on the number of trucks that could enter the facility on a daily basis, nor was there a limit on the number of tons of paper that could be delivered or sent out each day.
20. Stamford P Z approved City's plans in December 1996. Stamford P Z placed certain conditions upon City's operation in granting the approval (Exhibit 14) including: CT Page 3183 (a) hours of operation were limited to 6:00 A.M. through 8:00 P.M. Monday through Saturday only; (b) all work was to be done inside the facility; (c) truck access was to continue to be restricted to Taylor Reed Place; (d) waste oil and storage batteries could not be handled by the facility; and (e) no pulverizers or grinders or any machinery which would change the form of the material accepted would be allowed.
21. The recycling process could be done only by hand sorters, operating inside the building, and the materials were then to be sent to reprocessors without any change in their form.
22. After securing the approval of Stamford's P Z, City went to Hartford to the DEP to meet with staff and discuss the procedure for applying for an expanded permit.
23. City reviewed several DEP applications and was impressed by the applications prepared by Anchor Engineering. City hired Anchor to prepare its application.
24. The application (Exhibit 15) and the $9,500 application fee were submitted to the DEP in March 1997.
25. The first phase of the DEP review is to determine if the application is complete; this takes 30 days. City was notified the application was complete in approximately 30 days.
26. The second phase of the DEP review is a technical review of the application.
27. The DEP requires applicants such as City to publish a notice of the permit application in a local paper.
28. The DEP provides a form (Exhibit 16) for the applicant to use when submitting a notice of permit application to the local paper. City followed the form issued by the DEP in preparing their notice. The form requires City to identify any watershed that might be affected by the expansion.
29. The notice states "the facility is designed to process a total of 300 tons per day of construction and demolition debris, land clearing debris, pallets, clean wood, paper and cardboard, co-mingled containers, scrap metal and tires. The proposed activity will take place at 61 Taylor Reed CT Page 3184 Place, Stamford, Connecticut. The proposed activity will potentially affect: the Noroton River; on-site land and ground water."
30. City did not believe the facility would actually impact the Noroton River, on-site land or ground water because of the drainage and erosion measures City had previously taken. No water typically discharges from City's property.
31. City Recycling has never received a citation, warning or notice that it has polluted water.
32. Mr. Ferro was aware of Ann MacDonald's letter dated April 7, 1997 (Exhibit 17). Contrary to that letter, the City facility does not border either the Glenbrook Community Center (where the daycare center is housed) or any condominiums. City's Facility does not have any adverse environmental effect on the children at the daycare center or on anyone who lives near the site. The facility will not adversely affect the Noroton River since City has taken all required steps to control any drainage from the property.
33. City expected a public hearing on their proposal and prepared for it. City invited Stamford's Mayor and Representative MacDonald to inspect the facility, but neither has done so.
34. Prior to the public hearing, in early June, 1997, Mr. Ferro received a call from a lobbyist who told him City's application was in serious trouble because of proposed legislation. The lobbyist asked City to hire him. Ferro said he would have to speak to his partners first. However, the lobbyist called the next day to say City's application was already dead because of the passage of Public Act 97-300.
35. After being advised of the passage of the act, City called the DEP which later notified City that the application could not be processed because of P.A. 97-300 (Additional stipulated fact ¶ 59).
36. City's facility has no adverse affect on public health or safety. Mr. Ferro's children and his partner's children all work at City.
37. Problems posed by a volume reduction facility do not vary with the size of the City in which the facility is located or CT Page 3185 with its proximity to daycare centers.
38. Trucks coming and going to and from City do not impact on children going to the daycare center. The trucks do not go onto Crescent Street. The children are preschoolers who do not walk to the Center, but are dropped off in front of the Center on its driveway (Exhibit 8).
39. Crescent Street is a commercial street which contains warehouses, a delicatessen, cleaners, and apartments (Exhibits 2, 6).
40. City's DEP application (Exhibit 15, Attachment H, § 2.3) shows that trucks going to City Recycling will continue to avoid Crescent Street.
41. Trucks going to Southern Connecticut Recycling do so in close proximity to the Wider Community Center which houses a homeless shelter, a child care center, and a senior center, among other activities.
42. City Recycling, and its sister operation, City Carting, have not been fined since beginning operations. City Recycling has received a warning for leaving one container uncovered for one night; the problem was promptly addressed and resolved.
43. When material is tipped onto the floor within City's building, it is examined for any possibly contaminated containers; if any are found, they are pulled out and treated as regular garbage.
44. Wood would include demolition material. The local building codes require that asbestos and lead be removed prior to the granting of a demolition permit. If any asbestos or lead should reach City's tipping floor, it would be removed from the recycling stream at that point.
45. Some of the materials to be received by City may be combustible. Fire and Emergency precautions are discussed in the application (Exh. 15, Attachment H, § 4.0-4.3). There are extensive fire protection and prevention procedures and precautions in place.
46. If City accepts a load that has asbestos and a fire breaks out and goes out of control, it is theoretically possible. CT Page 3186 that airborne traces of toxic elements may be released. However, City has never received any asbestos materials. If it did, it would immediately call in a licensed remover.
47. When City receives non-recyclable items, those items are separated out and properly disposed of in accordance with the DEP and Stamford City regulations.
48. City has no problem separating out unacceptable material, as provided for in the application (Exh. 15. Attachment H, §§ 7.0-7.4).
49. Fire has never been a problem in the past even though City processes tons of paper each day.
50. City maintains residue containers on site (Exh. 15, Attachment H, § 7.4).
51. Asbestos does not burn.
52. A volume reduction facility such as City is allowed to receive ten percent residue (none-recyclables) in its load. Those materials must be removed within 24 hours.
53. There is no limit on the number of tires that City could receive, but they would not be a large part of what City handles since tires are not part of construction debris. If City should receive tires, it has a company that does spot removal.
54. There are no barrels of residue material that remain at City Recycling. City removes both recyclables and residue on a daily basis.
55. Mark Zessin is a principal of Anchor Engineering Services of Glastonbury. He has had personal experience with between 6-10 DEP applications for volume reduction facilities, over 20 DEP applications for transfer station permits, and over 10 DEP applications regarding landfills.
56. A volume reduction facility is one where recyclables are sorted, bailed, or processed.
57. City's application is to operate a facility which would not change the form of the items recycled. It would separate CT Page 3187 specific, non-toxic items out of the waste stream for reuse.
58. During the technical review process of a volume reduction facility application there are often comments and questions by the DEP. Typically, Zessin would work with the DEP at this stage to address those issues and in drafting the permit.
59. Municipalities in which a volume reduction facility seeks to operate are generally concerned with "nuisance issues": dust, traffic, noise, and odor.
60. The DEP requires local approvals of any proposed facility before it considers applications; the DEP relies on municipalities to weed out unwanted facilities.
61. Prior to passage of P.A. 97-300, there had never been any state requirements regarding the location and siting of a volume reduction facility.
62. There is an excellent fit between City's current operation and its proposed expansion because City already has in place a scale for tracking materials and a large building, it is adjacent to railroad tracks, it is close to 1-95 and a state highway, it has industrial neighbors, and it has a zoning permit in place from the Stamford Planning and Zoning Commission
63. If the permit were to be granted by the DEP, City would construct a new wing where trucks would back in. From the outside, the operations would not appear any different except that the building would seem larger.
64. There would be a limit on the amount of incoming materials of 300 tons per day (Exhibit 15, Attachment H, § 7.1).
65. There would be no technological changes at the site because an oil water separator has already been installed. There is a possibility of installing more galleys to contain storm water runoff.
66. There are no potential environmental hazards if City becomes a volume reduction facility.
67. City would accept only non-hazardous materials, which include materials not defined as hazardous by the EPA. CT Page 3188
68. Friable asbestos (asbestos that can flake and become airborne) is not a concern because it will be removed from any materials before they can be brought to City. If asbestos and lead did reach City, there are procedures to handle disposal (Exhibit 15, Attachment H, § 7.4).
69. Lead would not be able to leach into the water supply. If any lead happened to reach City, it would be processed inside City's plant and would not come into contact with moisture or water.
70. Waste oil and batteries would not be accepted by City under the Stamford P Z Certificate (Exhibit 14, § 9). There are other facilities which accept these items; the State's policy is to have these items recycled rather than being placed into garbage.
71. The proposed reduction facility, would not pose a ground water problem since all processing is done inside. The loads that come in are covered and the loads that leave are covered; there would be no contact with rain water (id. ¶ 4). City has already installed a separator for sediment and floatables inside its building with a galley system; there would be no water runoff from the building (Exhibit 11).
72. Dust and airborne debris would not create any hazard. Any possible dust would be caused by vehicles going over the paved site, but the processing occurs inside. Since there can be no changes to the form of the materials received, there should be no dust (Exhibit 14, ¶ 11).
73. Connecticut does have volume reduction facilities that are permitted to operate out of doors (Connecticut Carting in Waterford, Stratford Bailing in Stratford and the CRRA Facility at the Wallingford landfill). In addition, many Connecticut towns allow recyclables to be brought to outside containers.
74. Perishable materials are those that rot and decompose within days or weeks (food or leaves). The State requires these materials to be shipped out within 48 hours. Wood, paper and demolition materials are non-organic and do not attract pests. CT Page 3189
75. Even if demolition materials contained termites, the insects would not spread because no chipping occurs within the building and the building itself is steel and would neither attract nor sustain them.
76. Truck traffic to and from City does not pose a problem. The area is zoned for industrial use, so there is established truck traffic in the area including uses by neighboring facilities. Moreover, in this kind of VRF, truck traffic tends to be spread out over the course of the day rather than concentrated. Under the proposed permit, tonnage would be limited to 300 tons each day, as opposed to the unlimited amount now permitted.
77. Noise from City would not pose a problem. All of the operations occur inside, the opening in the building faces the railroad tracks which already generates noise, and the neighboring facilities also generate noise. City's new permit would not increase the overall noise level.
78. The DEP has historically been able to address environmental problems as they arise by effectively monitoring conditions and ordering remedial action in respect to Connecticut's VRFs.
79. City's application closely resembles the applications for facilities which have been granted by the DEP and are now in operation. City's proposed volume reduction facility would create fewer problems than other volume reduction facilities that operate outside (of a closed building). It would pose the same level of danger as other existing volume reduction facilities that operate inside.
80. There is nothing about proximity to a daycare center, or the size of a municipality in which a volume reduction facility is located, that makes any difference in the safety of its operations.
81. The DEP exercises less discretion in awarding a permit than do local zoning boards because the State's regulations are very specific and the State has well-developed guidelines concerning potential problems. If a permit meets the State's requirement, it will be granted unless the applicant has a bad compliance history. Local zoning boards often have no written guidelines for VRFs. CT Page 3190
82. A hearing is for the public to address its concerns, but the fact that there are concerns does not mean a permit will not be granted; instead, the public's concerns may result in some conditions being placed upon the permit.
83. It is highly probable that City's application would pass the DEP technical review process, and the public hearing, and that City would have received a permit from the DEP to operate in its present location as a multi-product, non-hazardous recycler of paper, wood, construction and land clearing debris.
84. The defendants offered no evidence that City's application for the subject VRF facility presented a reasonable possibility of environmental hazards.
85. The defendants presented no evidence that City's application for the subject VFR facility presented any increased possibility of environmental hazards in comparison to any of the existing VRFs now operating in Connecticut.
86. While City has complied with the declaratory judgment notice requirement of Practice Book § 17-55(4), no interested opponents, neighbors, abutting land owners or legislators offered any evidence that the proposed expansion of City Recycling's facility to operate a volume reduction facility for non-hazardous materials presents a reasonable possibility of environmental hazards.
D'Andrea, J.